Robert J. DAVIS et al. (Formerly Carnell Graves et al.), Plaintiffs,

v.

**BOARD OF EDUCATION OF NORTH LITTLE ROCK, ARKANSAS, et al., Defendants.**

No. LR–68–C–151.

United States District Court, E. D. Arkansas, W. D.

June 25, 1971.

See also D.C., 328 F.Supp. 1205.

John W. Walker and Philip E. Kaplan, Little Rock, Ark., for plaintiffs.

Robert V. Light and G. Ross Smith, Little Rock, Ark., for defendants.

## Memorandum Opinion

HENLEY, Chief Judge.

On June 24, 1971, this Court entered its most recent decree in subject case dealing with the racial integration of the public schools in the City of North Little Rock, Pulaski County, Arkansas. In its decree the Court stated that it was preparing and would shortly file a memorandum opinion incorporating its findings of fact and conclusions of law relevant to the issues considered by it. The Court now does so.

By way of introduction, the Court will make some historical comments about the case.

The North Little Rock Public Schools were first faced with desegregation litigation when this suit was commenced by Negro school patrons in 1968. As of that time students were being assigned to schools on the basis of freedom of choice, a system rendered impermissible in a district like North Little Rock by the 1968 decisions of the Supreme Court in Green v. County School Board of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716; Raney v. Board of Education of Gould School District, 391 U.S. 443, 88 S.Ct. 1697, 20 L.Ed.2d 727; Monroe v. Board of Commissioners of City of Jackson, 391 U.S. 450, 88 S. Ct. 1700, 20 L.Ed.2d 733. Under the freedom of choice method of student assignments the North Little Rock schools were essentially segregated at all grade levels, and staff and faculty were also essentially segregated.

As a result of the filing of this suit the District came forward with desegregation plans in 1969. The District proposed originally to desegregate its secondary schools by assignments of secondary grade students on the basis of geographical attendance zones but desired to continue to use freedom of choice for elementary school students. The plan also called for only token faculty desegregation.

On April 29, 1969, the Court filed an opinion and entered a decree which approved the District's plan of assigning secondary grade students to schools but which disapproved the plan as it affected faculty and elementary school students. Graves v. Board of Education, E.D.Ark., 299 F.Supp. 843 (1969), hereinafter called Graves I. The Court's decree enjoined the Board from maintaining further an unconstitutional dual school system, approved the proposed attendance zones for senior and junior high school students, and disapproved the District's plan as far as the elementary schools and faculty were concerned. The Board was directed to produce a new plan by May 15 dealing further with elementary student body and faculty desegregation.

The new plan was filed and was considered by the Court in an opinion filed on July 25, 1969, Graves v. Board of Education, E.D.Ark., 302 F.Supp. 136 (1969), hereinafter called Graves II. The Court was not satisfied with and did not approve the plan either as it applies to elementary assignments or as it applied to staff and faculty desegregation. However, the Court decided to permit the District to operate under it for the 1969–1970 school year only.

It was clear to the Court that the May 1969 plan which provided for the assignment of elementary students on the basis of geographical attendance zones geared to the neighborhood school concept would not and could not, in view of segregated housing patterns in North Little Rock, disestablish racially identifiable elementary schools in the District, and that such an objective could not be achieved except by the massive transportation of large numbers of elementary students to and from schools substantially distant from their homes.[1]

In both Graves I and Graves II the Court expressed its opposition to "busing" of small children long distances

---

1. Exactly the same situation existed with respect to elementary schools in the Little Rock School District located across the Arkansas River from North Little Rock.

twice a day for no purpose other than to achieve racial balance in the District's elementary schools, and expressed the view that the Constitution did not require such busing for that purpose. The Court also called attention to the fact that financially and logistically the District was not in any position to undertake large scale transportation of students and to the further fact that existing public transportation facilities in North Little Rock were inadequate to the task of transporting large numbers of elementary school children to and from school each day. And the Court also pointed to the lack of clear appellate guidelines as to how much in the way of integration local school districts were constitutionally required to achieve.

On the same day on which it decided Graves II the Court also handed down what may have been the last of the long series of decisions designed to eliminate segregation in the schools of the Dollarway School District in Jefferson County, Arkansas. Cato v. Parham, E.D.Ark., 302 F.Supp. 129 (1969). In Graves II the Court distinguished the situation existing at Dollarway from the situation existing in North Little Rock, and the results reached in the two cases were different.

It had been the expectation, indeed the hope, of the Court in deciding Graves II and Cato that one or both decisions would be appealed, and that the appeal or appeals would produce the guidelines mentioned in Graves II. As things turned out, there was no appeal from either Graves I or Graves II. An appeal was taken in Cato, but the appeal was dismissed in June 1970 without any action having been taken on it by the Court of Appeals.

In May 1970 the Court of Appeals handed down its decision in the Little Rock school case reversing a decision of the late Judge Gordon E. Young which had approved in 1969 a desegregation plan submitted by the Little Rock School Board. Clark v. Board of Education of Little Rock, 8 Cir., 426 F.2d 1035 (1970). Upon remand the case fell to the docket of the undersigned so that he is now required to deal with both North Little Rock and Little Rock.

Following the remand of *Clark* both cases were considered by the Court in the summer of 1970. In the instant case a report had been filed by the District on July 17, and it was dealt with a month later in an unpublished memorandum opinion which may be called Graves III. In that opinion the Court pointed out preliminarily that appellate opinions handed down by the Court of Appeals for this Circuit since Graves II, including Clark, had continued to be lacking in guidelines that were particularly helpful in dealing with districts like North Little Rock and Little Rock.

On the merits the Court recognized that with respect to the rapidly approaching commencement of the 1970–71 school year the elementary schools would remain about as segregated as they had ever been but taking the same approach that it had taken the year before the Court decided to permit the District to assign elementary students to schools on the basis of geographical zones for the 1970–71 school year. The Court again referred to the absence of guidelines and again expressed its opposition to massive transportation of students merely to achieve racial balance.

As to staff and faculty, the Court found that substantial progress in that area had been made, and that none of the schools of the District, whether elementary or secondary, could be identified racially on the basis of classroom teacher assignments. The Court found that on this phase of the case the principal complaint of plaintiffs was that as integration proceeded Negro supervisory personnel and coaches would suffer from the standpoint of status and perhaps fi-

Much that the Court said in both Graves cases about North Little Rock was applicable to Little Rock; and much that the Court will have to say in this opinion about the North Little Rock elementary schools will be applicable to the Little Rock elementary schools.

nancially. However, the Court considered that the problem about Negro supervisors and coaches was of less immediate importance than the problem of the integration of student bodies and class room teachers. And the Court was not willing to disturb staff, athletic or faculty assignments for the approaching school year.

At about the same time that it decided Graves III, the Court also handed down a similar decision in the Little Rock case. Appeals were promptly taken in both cases. The Court of Appeals deferred ruling on the appeals pending decision by the Supreme Court of the United States in certain desegregation cases pending before it from other Circuits.

On April 20 of this year the Supreme Court handed down its decisions in Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); Davis v. Board of School Commissioners of Mobile County, 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577 (1971); North Carolina State Board of Education v. Swann, 402 U.S. 43, 91 S.Ct. 1284, 28 L.Ed.2d 586 (1971); and McDaniel v. Barresi, 402 U.S. 39, 91 S.Ct. 1287, 23 L.Ed.2d 582 (1971).[2] The Court of Appeals promptly remanded both this case and the Little Rock case to this Court for further consideration in the light of the Supreme Court holdings just cited. The Court was directed, among other things, to call for new plans from both Districts, to hold hearings, and to rule on the sufficiency of the plans not later than August 1 of this year.

Both Districts filed new plans on June 8. The Little Rock case was heard on June 16, 17, and 18; this case was heard on June 21.[3] Preliminary consideration of the two plans immediately raised in the mind of the Court a doubt as to the sufficiency of the North Little Rock plan at the elementary school level and a doubt as to the sufficiency of the Little Rock plan at that level and to some extent at the secondary school level. Consequently, a few days before the hearings began both Districts were invited to submit alternative plans which would unquestionably disestablish racially identifiable schools at all levels, although neither District was required necessarily to advocate its alternative plan or plans.

The North Little Rock District accepted the Court's invitation.[4] An alternative plan was adopted on June 17 and was filed in the course of the hearing on June 21. For convenience that plan has been called and will be called the "Storm Plan" after one of its authors. While the plan is before the Court, the members of the School Board, including Mr. Storm, do not advocate it; they prefer the plan that they filed on June 8. Plaintiffs have certain objections to both the June 8 plan and the Storm Plan.

Having so stated the case, the Court turns to a consideration of the issues. The main issue is as to the sufficiency of the June 8 plan or the Storm Plan as a means of integrating the elementary schools; no serious issue is presented as to the sufficiency of the June 8 plan at the secondary school level, and in its de-

2. Of those four decisions the Charlotte-Mecklenburg case, hereinafter called Swann, appears to be the most significant just as the New Kent County case was the most significant of the three decisions of the Supreme Court handed down in 1968.

3. If these cases involved nothing but the elementary schools of the two districts, the Court would consider both districts in the same opinion. However, the overall school situation at Little Rock presents some problems that are not present in the

North Little Rock case, and for that reason the Court thinks it well to handle the two cases separately.

4. The Little Rock District considered a number of alternative plans before adopting the one that was filed on June 8. The Court was advised of the provisions of the discarded alternatives, but the District did not prior to or at the June hearing come forward with any additional alternative plan pursuant to the Court's invitation.

cree of June 24 the Court approved that plan for Grades 7–12. There are subsidiary issues as to staff and faculty desegregation and as to the propriety of the completion of certain construction undertaken last year at the Amboy Elementary School.[5] The Court finds it convenient to deal with those subsidiary issues first.

## I.

The District has been enjoined heretofore to integrate its staff and faculties and not to discriminate against Negro employees. The Court finds that staff and faculty are essentially integrated. In 1971, as in 1970, it appears to the Court that the complaints of plaintiffs are directed primarily at individual staff and faculty assignments. Again the Court considers that those complaints are minor when viewed in comparison with the underlying problem about elementary student assignments; and again the Court is not willing to try to deal with such complaints until the underlying problem has been solved.

## II.

Counsel for the plaintiffs in both this case and the Little Rock case have contended consistently that in both Districts white school patrons are moving away from Negro neighborhoods, and that the school boards are unconstitutionally aiding this "white flight" by constructing new schools for the education of white students in the southern and western parts of the Little Rock and in the northern and eastern parts of the North Little Rock District.

Whether the western and southern migrations of white people in Little Rock and the northern and eastern migrations of white people in North Little Rock may properly be characterized as "white flight" or not, there is no question that the migrations are taking place, that they involve large numbers of people, and that schools for the children are needed.

■ It has been noted that the Court was called upon to consider in 1970 whether the construction at the Amboy Elementary School should be enjoined. The Court's then view that it should not be interrupted appears in an unpublished opinion filed on December 8, which may be called Graves IV. The Court now makes reference to that opinion for a full description and discussion of the construction which had actually been undertaken before it was interrupted by the order of the Court of Appeals. No useful purpose would be served by repeating here what was said in Graves IV. The Court adheres to its view that the construction is necessary and should not be prevented. The Court is convinced that the construction will not interfere with integration or promote or foster segregation. It is not an objectionable improvement of a "white" school to the neglect of a "black" school. Cf. Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896), and other cases dealing with the "separate but equal" doctrine. There are two brief additional statements that the Court desires to make.

When Graves IV was written, it was not known whether Amboy would remain an all white school or whether it ultimately would be integrated. Under the Storm Plan, which has been approved, Amboy, like all of the other elementary schools of the District, will be as of 1972–73 a fully integrated facility.

---

5. There is a similar controversy in the Little Rock case about construction at Henderson Junior High School. While the appeals in the two cases were pending, the Court of Appeals entered limited orders of remand in both in order to enable the Court to consider whether the construction should be enjoined. In both cases the Court refused to enjoin the construction, and plaintiffs applied for further relief to the Court of Appeals. In December 1970 the Court of Appeals ordered the construction of both schools to be halted during the pendency of the appeals. The current orders of remand direct the Court to consider anew the construction problem in both Districts.

Further, before the Court of Appeals stopped the Amboy construction, the District had spent some $60,000 on the project, and it was well under way. Photographs introduced in evidence at the hearing on June 21 show the present condition of the interrupted building program. Not to permit this work to be completed would constitute an utter waste of money and materials and would achieve no useful purpose whatever. On the contrary, if the construction is allowed to proceed to completion, elementary students of both races will receive their education in a modern, up-to-date school plant, and will not have to attend classes in portable class rooms, as has been the case heretofore. In its June 24 decree the Court refused to enjoin the construction and permitted it to proceed.

### III.

As stated, the Court has approved the Storm Plan relating to the assignment of elementary students to schools, and in so doing has disapproved in that respect the Board's plan of June 8.

During the 1969–70 and 1970–71 school years residential zoning for elementary school students in North Little Rock produced no meaningful integration. The situation that prevailed during 1970–71 differed but little from that described in Graves II, supra, as existing with respect to the preceding school year.

Figures of record indicate that Negroes make up from 22.5 percent to about 25 percent of the District's elementary school population. There are four elementary schools out of the twenty operated by the District which have traditionally been "black schools." Those schools are Carver, Lincoln, Roosevelt, and Woodson. Those schools are located in the southern and eastern parts of the District. Two elementary schools located generally in those parts of the District, Meadow Park and Rose City, have traditionally been "white schools." The June 8 plan calls for a pairing of Roosevelt with Meadow Park and of Woodson with Rose City. The plan does not touch the other sixteen elementary schools in any way.

The pairings just mentioned would probably produce at Meadow Park a black minority of 42.8 percent; a similar minority of 39.3 percent would be at Roosevelt; Rose City would have a black enrollment of 55.2 percent; and Woodson would have a black enrollment of 52.5 percent. Carver would be 97.5 percent black and Lincoln would be 85.9 percent black under the plan; all of the rest of the elementary schools, except Clendenin, would either be all white or the Negro minorities in them would be insignificant, 5.8 percent at McRae and 2.4 percent at Baring Cross. At Clendenin there would be a black minority of 47.7 percent.

■ Obviously, the June 8 plan simply would not disestablish a dual elementary school system or sub-system in North Little Rock as required by Swann. That objective will be accomplished by the Storm Plan.

The Court will pretermit a detailed discussion of that plan. Under it the twenty elementary schools of the District are divided into four groups with each group containing one of the traditionally black schools. The heart of the plan is the transfer of large numbers of black students from the black schools in the respective groups to the white schools in those groups and replacing them with white students. The students to be transferred within each group of schools will be randomly selected in a manner described in the plan.

The plan provides further that the white students to be transferred will be rotated from year to year. Black students transferred under the plan will not be rotated. Some black students will not be transferred and will receive all of their elementary education in the schools nearest their homes. The Court thinks

that this feature of the plan may evoke some complaints, and with time and experience the Board may want to eliminate it or modify it, which it will be free to do, but the Court does not think that it discriminates against Negroes as a race.

Of course, neither the Storm Plan nor any other rational plan will achieve absolute mathematical balance in each and every one of the elementary schools, but it will achieve substantial balance in each school, and the variations from the ideal certainly appear to be within tolerable limits.

The Court's real difficulty with the case at this stage is whether to order the Storm Plan to be put into effect this fall or whether to wait until the opening of school for the 1972–73 session.

It has been obvious to everyone concerned ever since the commencement of this lawsuit that full integration or racial balance cannot be achieved in all of the elementary schools in North Little Rock without the massive transportation of large numbers of elementary school children for substantial distances within the limits of the District twice a day in all kinds of weather for nine months of each year. It would be ridiculous to assign students to schools which they cannot reach, and unless the District provides necessary transportation, there would be hundreds of children of both races who could not attend the schools to which they would be assigned.

The Court adheres to the views that it has expressed heretofore about transportation of elementary school students simply to achieve racial balance. Such transportation serves no useful educational purpose. As pointed out in *Swann*, the practice of transporting children to and from school by means of school buses was designed primarily to get rural children out of small one room schools and into more efficient consolidated schools, or into urban schools.

Such transportation of students for such a purpose makes educational sense; but the daily hauling of students all over a large city merely to achieve racial balance in all schools is educational nonsense.

Apart from theory, the Court is faced with the hard fact in this case that the North Little Rock District has never transported students on a large scale and it owns no buses. It did provide last year free transportation for some needy students using for that purpose available federal funds and privately owned vehicles. The public transportation system in North Little Rock is just as inadequate today as it has been in past years.

While the Board may exaggerate to some extent the cost of acquiring necessary buses by lease or purchase, it is obvious that such acquisition will be an extremely costly undertaking. Additionally buses have to be operated and maintained, and insurance has to be bought and paid for.

The Court thinks it fair to say that within a reasonable period of time, say nine months or a year, the District would probably be able to acquire, maintain, and operate buses at a net cost that would not be crushing and that it could afford, taking into consideration available State aid and perhaps other sources of funds that might be developed. But the Court is convinced that assuming the availability of adequate buses the District today is financially unable to acquire and put into operation the requisite number of buses without drastically revising its current budget, a revision that would curtail and seriously impoverish the quality of education offered at all grade levels. Such curtailment might, among other things, entail the discharge of teachers and staff members in violation of existing contract rights, a course which would almost certainly plunge the District into more litigation.

But, even if the District had adequate funds, it would be extremely difficult,

if not impossible, for the Board to locate and acquire a sufficient number of buses to permit the Storm Plan to be implemented by the opening of school this year, which opening is only about two months away. Any transportation plan that the Board might be able to devise and implement on such short notice would inevitably be make-shift and unsatisfactory and would tend to make the whole idea of busing more distasteful to the patrons of the District, both white and black, than it already is.

 As far as busing is concerned, it is important to realize what *Swann* held and what it did not hold. The function of the Supreme Court in *Swann* was quite different from the function of this Court in this case. In *Swann* the Supreme Court sat as an appellate court reviewing the power of a district court to order busing in a school district which, entirely aside from any purpose connected with integration, has bused thousands of its students for many years, and which owned numerous buses, and which encountered no difficulty in securing additional buses called for by the plan which the District Court ordered put into effect. The Supreme Court simply affirmed the action of the District Court in doing what it had already done. It did not hold that the plan ordered into effect by the District Court was a constitutionally commanded plan or that a less drastic plan might not have met constitutional requirements. To put it another way, *Swann* holds that busing is a proper method to bring about racial balance in the schools and one that may be employed in a proper case; *Swann* does not hold, or at least it does not say, that busing is ever constitutionally *required*, and it certainly does not say that a district court in framing a remedy in a case of this kind and exercising in that connection the judicial discretion of a court of equity must leave out of account the ability, financial or other, of the affected school district to comply with the court's decree. At least some support for the Court's reading of *Swann* is to be found in the very recent decision of the Court of Appeals for the Sixth Circuit in Northcross v. Board of Education of Memphis City Schools, 6 Cir., 444 F.2d 1184, decided on June 7, 1971.

In view of the consistent course of judicial decisions in recent years in integration cases, a course frequently characterized by a tendency of appellate courts to order more than the trial courts have ordered but without saying how much more, the Court thinks that it is certainly predictable, and the Court will reluctantly predict, that sooner or later the federal appellate courts are going to hold that the Constitution requires busing in school districts in which busing is the only means of eliminating racially identifiable schools. It is on the basis of that prediction that the Court is approving the Storm Plan for the elementary grades rather than the Board's original plan.

But, the federal appellate courts have not yet so held, and the Court thinks that they should have an opportunity to do so before the Storm Plan goes into effect, particularly in view of the heretofore described situation that prevails in the defendant District. There will be plenty of time to present the questions involved before school opens in September 1972.

It is possible that the Court's prediction that it will be held ultimately that in a school district like North Little Rock or Little Rock busing to achieve integration is constitutionally required will turn out to be wrong. If it does, there would appear to be no occasion to implement the Storm Plan or any plan similar to it.